JOHN H. SUMMERSKILL *v.* VERMONT POWER AND MANUFACTURING COMPANY.

May Term, 1916.

Present: MUNSON, C. J., WATSON, HASELTON, POWERS, and TAYLOR, JJ.

Opinion filed February 16, 1917.

*Master and Servant—Negligence—Question for Jury—Fellow Servant Rule—When not Applicable—Concurrent Negligence of Master and Fellow Servant—Proximate Cause— Assumption of Risk—Extraordinary Risks—Risk Due to Negligence of Master—Who are Fellow Servants—Safe*

*Place Doctrine—Work of Construction and not of Operation —Non-Delegable Duties of Master—Respondeat Superior— Exceptions—Abstract Questions—Verdict—When not Excessive.*

In an action brought by a lineman employed by an electric light and power company against the company to recover for injuries received from a charged electric wire, where it appeared that the defendant's superintendent had previously telephoned an employee at the power house to cut off the power from the line in question, which had not been done, it was for the jury to say whether it was negligence on the part of the company not to have a rule requiring the employee to report the performance of such an order, and whether the lack of such a rule was a proximate cause of the accident.

In an action to recover damages for personal injuries brought by an employee against his employer, the fellow servant rule does not apply where the negligence of the employer concurred with that of the fellow servants in causing the injuries.

Where evidence tended to show that a telephone message sent by the superintendent of an electric light and power company to "cut out the lighting line" was heard by the one receiving it as "cut out the power line," the questions whether the telephone line was defective, and whether this condition was a proximate cause of the injuries of plaintiff, a lineman, injured by coming in contact with a charged electric wire, were for the jury.

The fact that plaintiff once or twice talked into a certain telephone, and that it was very noisy, did not show as matter of law that he knew all about it and assumed the risks consequent upon its defects.

Mere knowledge on the part of a lineman employed by an electric light and power company of the absence of a rule of the company requiring an employee at the power house to report to the superintendent the performance of orders given by him as to cutting off power from the lines of the company did not as matter of law charge the lineman with the assumption of the risk encountered by him in working upon the electric wires, nor was such mere knowledge inconsistent with a finding by a jury that he did not assume the risk.

The fact that a lineman in the employ of an electric light and power company was nearby while the superintendent telephoned an order

to the power house to cut off the power from one of the lines and waited a sufficient time for the performance of the order did not as matter of law charge him with assumption of the risk of injury attendant upon the non-performance thereof.

A servant does not assume extraordinary risks which he understands, and has a right to understand, do not exist.

A risk due to the negligence of the master is extraordinary.

Where a lineman in the employ of an electric light and power company was injured by coming in contact with a charged electric wire, it was negligence on the part of an employee of the company, when inquired of over the telephone previous to the accident whether the line of wires was clear of electric current, to reply that it was, without having looked at the switch, upon the supposition that another employee had obeyed instructions to cut out the line.

Employees of an electric light and power company, who were instructed to cut off the electric power from a line of wires prior to the removal of the line from one side of a highway to the other, were not fellow servants of a lineman in the employ of the company, in such a sense as to make the fellow servant doctrine applicable, but stood in the place of the master in performing a non-delegable duty, and the master was liable for their negligence in failing to cut off the power, as a result of which the lineman was injured; because, the work being of construction or reconstruction, and not of operation merely, the safe place doctrine applied.

The safe place doctrine does not make the master an insurer, for it does not make him liable for mere accidents, but only for the consequences of his negligence, or that of his servants in the performance of his non-delegable duties.

When, in an action by a servant against his master for personal injuries, the fellow servant doctrine does not apply, the maxim that the principal must respond is applicable.

Negligence alone of servants charged with the performance of the master's non-delegable duties that is a proximate cause of an injury to another servant is, in the absence of assumption of risk or contributory negligence on the part of the latter, enough to make the master liable, and it is not essential to such liability that there should also be incompetency on the part of such servants with knowledge of which the master is chargeable.

Exceptions raising merely abstract questions are not entitled to consideration.

Under the circumstances, *held*, it was not an abuse of discretion for the trial court to deny defendant's motion to set aside the verdict for plaintiff for $7,500, as being excessive.

CASE FOR NEGLIGENCE. Plea, the general issue. Trial by jury at the September Term, 1915, Franklin County, *Butler,* J., presiding. Verdict for the plaintiff. Defendant excepted. The opinion states the facts.

*John W. Redmond* and *Charles F. Black* for the defendant.

*Roswell M. Austin* for the plaintiff.

HASELTON, J. This is an action of case for negligence. Trial was by jury and verdict and judgment were for the plaintiff. The defendant brings exceptions.

At all times material hereto defendant owned and operated an electric plant, and the plaintiff, while in its employ as a lineman, was injured by an electric current which left one of the defendant's lines and entered the plaintiff's body. At the close of the evidence the defendant made a motion for a verdict in its favor which, under exception, was overruled.

The grounds of the motion, so far as they pointed out anything, were first, that there was no evidence tending to show any negligence on the part of the defendant that was the proximate cause of the accident, and, secondly, that any negligence that the evidence tended to show was the negligence of a fellow servant. At all times material to this case the defendant owned a hydro-electric plant at Fairfax Falls where it generated electricity, and from a power house there conducted electricity to St. Albans, a distance of about 14 miles, by two lines of three wires each, one line being the power line and the other the lighting line. Near the power house at Fairfax Falls is a transformer house and at the south limit of St. Albans is a substation. Between the transformer house and the substation the lines carried about 16,000 volts of electricity. The defendant had a business office in St. Albans. The New England telephone and a private telephone of the defendant were used by the company in its operations.

Walter H. Vorce was the defendant's general manager, and A. W. Peterson was its superintendent, his duties among others being to superintend the maintenance and construction of lines, and to employ and discharge men.   August 4, 1914, he set about changing the lines at a certain point from the west side of a road to the east side, and for that purpose took out with him five or six men, one of whom was the plaintiff.   His intention was first to move the lighting line.   To that end he telephoned over the company's telephone from the St. Albans substation to the power house to cut out the lighting line.   One Lassell, a helper at the power house, answered, but one Hurley, the chief operator, who was not intending to work that day, also answered from his house, where messages to the power house were also received over that telephone, and the order to cut out the lighting line was repeated to Hurley, who said "all right."   Then without waiting for a message that the lighting line had been cut out, the superintendent, with the men referred to, started for the point where the work was to be done.   Hurley understood the message to be "cut out the power line" and proceeded to the transformer house to do that, and manipulated the switches there for that purpose, but in fact cut out neither the power line nor the lighting line.   Before the superintendent with his men reached the point where the moving of the lighting line was to be done, he stopped at a farm house, and called up the power-house over the New England telephone.   One Robinson, an operator under Hurley, answered this time and upon being asked if the lighting line was cut out, answered "yes, everything is all right," or "the line is clear."   At that time Robinson knew nothing about the matter, had not seen the switching done, did not look at the switches, and answered as he did, because he supposed that Hurley had done what he had been told to do, although there was evidence to the effect that before Robinson answered the telephone as he did, Hurley had told Robinson that it was the power line the former had cut out.

After Robinson's unfounded assurance, the superintendent with his men, including the plaintiff, went to the place where the work of moving was to be done, the plaintiff went up a pole to commence work at the suggestion of the superintendent, and received his injury in consequence of the fact that the lighting line was not cut out, but was carrying a heavy voltage of electricity.

It was and is conceded that the plaintiff in all that he did was in the exercise of due care.

The defendant had promulgated rules and regulations for the government of employees but had no rule requiring an employee at the power house, who had received an order over the telephone, to report to the person giving the order what had been done in fulfillment thereof. This was generally done, however, done, "at times," for it was a recognized measure of reasonable safety, in view of the nature of the business; but as we have seen it was not done in this case, and it was for the jury to say whether or not it was negligence on the part of the company not to have such a rule, and whether or not the lack of such a rule was not a proximate cause of the accident. Therefore the motion for a verdict could not be granted irrespective of the fellow servant doctrine and its application here, a question to be considered later. *Mahoney's Adm'r* v. *Rutland R. R. Co.*, 78 Vt. 244, 62 Atl. 722; *Griffin* v. *Boston & Maine Railroad*, 87 Vt. 278, 287, 89 Atl. 220.

So in considering this motion for a verdict, we do not discuss the fellow servant question, since if the defendant's negligence and that of fellow servants of the plaintiff concurred as proximate causes of the injury to the plaintiff, the defendant's motion for a verdict could not prevail.

The court submitted to the jury the question of whether the company's telephone, over which the order to cut out the lighting line was given, was defective and was a proximate cause of the injury. The evidence tended to show that the telephone was noisy, sometimes less and sometimes more, sometimes very noisy, and that this was so because the telephone wire was strung on the poles over which the high tension wires were strung conveying about 16,000 volts of electricity.

To the submission of this question to the jury the defendant excepted. One ground of the exception was that there was no evidence tending to show that the defective telephone was the proximate cause of the injury, because all the evidence was that the telephone was working all right on the day of the accident. But, to say nothing more, since the evidence tended to show that the telephone message to "cut out the lighting line" was heard by the one receiving it as a message to "cut out the power line," the jury was justified in finding that the telephone was not working all right. The defendant in its brief states that the plain-

tiff's evidence tended to show that it was because of the defective company telephone that the order referred to was misunderstood.

The other grounds of the exception were that there was no evidence tending to show that the plaintiff did not know all about the defective telephone, and that the evidence showed affirmatively that he did know all about it, because he testified that a short time before the accident he talked into the telephone and it was very noisy. But the fact that he had once or twice talked into the telephone, fell far short of showing that he knew all about it. To put the matter affirmatively, the whole testimony tended to show that he did not know all about it and did not assume the risks consequent upon its defects and caprices.

The defendant excepted to the failure of the court to instruct the jury that on the evidence in the case, the faulty telephone was not the proximate cause of the accident, and to the failure of the court to instruct the jury that there was no evidence in the case warranting the inference that an inadequate telephone was the proximate cause of the accident. These exceptions simply raise, in a different form, the question just considered and disposed of.

Exceptions were taken to the submission to the jury of the question of Hurley's incompetency, and that of Robinson and of Peterson. These exceptions we will consider in another connection.

The defendant excepted to the submission to the jury of the defendant's liability for not having a rule such as has been referred to in discussing its motion for a verdict in its favor. The first ground of the exception was that there was no evidence in the case tending to show that the failure to have such a rule was the proximate cause of the injury. This ground of the exception we have disposed of in considering the motion for a verdict.

The second ground of the exception was that there was no evidence tending to show that the plaintiff did not know all about the absence of such a rule, and that the burden was on the plaintiff to show non-assumption of risk. It did not appear whether this lineman did or did not know about the absence of such a rule, some of the rules of the company were in writing and some were not; but mere knowledge of the absence of such a rule would not charge this lineman with the assumption of the risk

17

which he encountered, nor would such mere knowledge be inconsistent with a finding by the jury on all the evidence that he did not assume.the risk.

The third ground of the exception is as follows: "There is no evidence in this case tending to show that in this particular instance, the plaintiff who was right with Mr. Peterson at the time that Mr. Peterson gave the order at the substation and heard him give the order, did not know that Mr. Hurley did not repeat back to Mr. Peterson that he had fulfilled the order; indeed the evidence affirmatively shows that the plaintiff heard Mr. Peterson give the order and went away with Peterson from the substation before the confirmation had been received."

It appeared that the plaintiff was outside the substation when Peterson gave the order, and that he heard it given. But it appeared also that Peterson waited in the substation to hear from Hurley 10 or 15 minutes, a sufficiently long time to enable Hurley to execute the order and report its execution.

The claim that there was any assumption of risk by the plaintiff because he was near the substation, while Peterson was inside telephoning and waiting, and that because of that fact it was not open to the jury to say that he did not assume the risk is without foundation in the law of the assumption of risks, known, fully comprehended and voluntarily encountered.

The claim as to the assumption of risk, so far as it related to the defective telephone and the absence of such a rule as has been discussed, was again raised by a motion to set aside the verdict which was overruled; but while we shall have occasion later to refer to that motion, we shall enter upon no further discussion of the specific claims as to the assumption of risk.

As the question of assumption of risk was raised and is here argued somewhat in piece-meal, we refer to a portion of the transcript wherein it appears that the defendant's counsel admitted in open court that the plaintiff had a right to suppose that the line was dead, "had a right to understand and did understand that the line was dead." Surely, a servant does not assume extraordinary risks, which he understands and has a right to understand do not exist. And there was evidence tending to show that the risk here encountered was due to the negligence of the master, and so was extraordinary, a matter that will further be discussed.

There was strong evidence of negligence on the part of

Hurley the chief operator and of his assistant Robinson. The evidence tended to show that it was owing to Hurley's carelessness that he failed to cut off the power from the lighting line. It was negligence on the part of Robinson, when inquired of over the New England telephone if the lighting line was clear, to reply that it was, when his evidence tended to show that he did not even look at the switches, but replied as he did, because he supposed Hurley understood his business. But the defendant claims that Hurley and Robinson and indeed Peterson were fellow servants of the plaintiff, and that the company was not chargeable with their negligence unless they were incompetent and their incompetence was known or ought to have been known to the defendant; and the defendant excepted to the submission to the jury of the question of their incompetency in view of the state of the evidence.

The work here in hand was a work of construction or reconstruction and not of mere operation of the system, that is, it was the removal of the high tension lines from one side of a highway to the other, and the safe place doctrine applied, and in entering upon the work, these men were not fellow servants of the plaintiff in such a sense as to make the fellow servant doctrine applicable, but stood in the place of the master in performing a nondelegable duty, that is, a duty which the master could not so delegate even to competent servants as to relieve him from liability for the negligence of which, as the evidence tended to show, these men were guilty in the course of their employment. The well established doctrine which applies here does not make the employer an insurer, for it does not make him liable for mere accidents, but only for the consequences of negligence by him or his servants in the performance of the master's nondelegable duties.

Where the fellow servant doctrine does not apply, the maxim that the principal must respond is applicable, as it is in cases of injuries to a third person by the negligence of a servant. *Lassasso* v. *Jones Bros.*, 88 Vt. 526, 533, 93 Atl. 266; *Griffin* v. *Boston & Maine Railroad*, 87 Vt. 278, 287, 89 Atl. 220; *Lincoln* v. *Central Vt. Ry. Co.*, 82 Vt. 187, 193, 72 Atl. 821, 137 Am. St. Rep. 998; *Vaillancourt* v. *Grand Trunk Ry. Co.*, 82 Vt. 416, 432, 433, 74 Atl. 99; *Kiley* v. *Rutland R. Co.*, 80 Vt. 536, 546, 548, 68 Atl. 713, 13 Ann. Cas. 269; *Houston* v. *Brush et al.*, 66 Vt. 331, 29 Atl. 380; *Davis* v. *Central Vermont Ry. Co.*, 55 Vt. 84, 45 Am. Rep.

590; *Hough* v. *Railway Co.,* 100 U. S. 213, 25 L. ed. 612; *Northern Pacific R. Co.* v. *Herbert,* 116 U. S. 642, 29 L. ed. 755, 6 Sup. Ct. 590; *Texas & Pacific Ry. Co.* v. *Barrett,* 166 U. S. 617, 41 L. ed. 1136, 17 Sup. Ct. 707; *Evansville Gas & Electric Light Co.* v. *Robertson,* 55 Ind. App. 353, 100 N. E. 689; *Blohm* v. *Boston Elevated Ry. Co.,* 221 Mass. 390, 108 N. E. 1040; *Killmeyer* v. *Forged Steel Wheel Co.,* 243 Pa. 110, 89 Atl. 810; *Bernheimer Bros.* v. *Bager,* 108 Md. 551, 70 Atl. 91, 129 Am. St. Rep. 458; *Maki* v. *Isle Royale Copper Co.,* 180 Mich. 624, 147 N. W. 533; *Crist* v. *Wichita Gas, Electric Light & Power Co.,* 72 Kan. 135, 83 Pac. 199.

The charge of the court went beyond the law in the defendant's favor and the defendant cannot complain. For, as to the master's duties that these employees were performing, negligence alone that was a proximate cause of the injury to the plaintiff was, in the absence of assumption of risk or contributory negligence on his part, enough to make the defendant liable; whereas the charge made essential to the defendant's liability not only such negligence but also incompetency with knowledge of which the defendant was chargeable. By its motion to set aside the verdict and its exception to the overruling of the motion the defendant raised specifically the question as to Hurley's incompetency, but the question so raised does not require separate treatment.

Other exceptions taken were based upon the theory that Hurley, Robinson and Peterson were fellow servants of the plaintiff in the performance of what we hold to have been a nondelegable duty of the defendant but as the men named were not, in the matter in hand, fellow servants of the plaintiff, these exceptions raise merely abstract questions, and are not entitled to consideration.

Exceptions to evidence were taken relating to the claimed incompetency of Hurley and the defendant's knowledge of it, but they all went upon the ground that Hurley was merely a fellow servant of the plaintiff, and are not necessary to be considered. Were it necessary to consider them we should feel obliged to refer at some length to the testimony of A. F. Hathaway, an electrical operator, who worked with Hurley in the defendant's employ for five or six years, but at the time of the trial was superintendent of the plant at Hardwick. It would also be necessary to recite in substance the testimony of Patrick Fitzgerald, for many years a policeman in the City of St. Albans, and to con-

sider in connection with the testimony of Hathaway and Fitzgerald, expert testimony given by Doctors Alexander Hutchinson and Gordon Campbell of Montreal and Doctors Alan Davidson and Arthur Morton of St. Albans.  But as the fellow servant doctrine is inapplicable here, a review of this testimony and of the exceptions taken in connection therewith is unnecessary.

We have already referred to the defendant's motion to have the verdict set aside, to the overruling of the motion and to the exception of the defendant to the action of the court in that regard.

The plaintiff's verdict was for $7,500, and one ground of the motion was that the verdict was excessive and so excessive as to show that the jury disregarded the evidence, and that the verdict was not the result of reason and judgment, but of passion, sympathy or prejudice.  It is claimed here that it was an abuse of discretion for the trial court to deny the motion on this ground.

The evidence tended to show the following facts:  The plaintiff, John Summerskill, completed a high school course in St. Albans and Montreal and thereafter entered McGill University in the department of applied sciences, for the purpose of studying electrical engineering and took that course, graduating therein in May, 1914.  He then entered the employ of the defendant as lineman and had been in its employ about three months when the accident in question occurred.  At that time he was a healthy and intelligent young man twenty-three years of age.  The electricity that injured him leaped with a spark or flash for about four inches from one of the wires which together were carrying about 16,000 volts, and went through his body, entering at one of his hands and going out at one of his feet.  How much electricity actually leaped from the high tension wires, it was of course impossible to show.  The muscles of one part of his body were for a time rigid or frozen, and when they became relaxed there developed a condition of involuntary jerking and shaking of the muscles of the arm, leg and head, which was attended with pain and soreness.  Though he had treatment and advice from eminent physicians a condition of traumatic neurasthenia developed.  At the time of the trial, a year and some months after the accident, his general condition had improved to a marked degree, but there was competent evidence strongly tending to show an uncontrollable dread on the part of the plaintiff in the presence of high tension wires, a dread that

would not yield to reason, that was likely to be permanent and serious, a life long impairment of the capacity of·this young man in doing electrical work in his chosen profession. The story of his condition during the time from the accident to the trial, and the prognosis of his case by physicians whose qualifications were conceded, make it impossible for us to say that there was any abuse of discretion in the refusal of the court to set aside the verdict on the ground that it was excessive.

All questions raised by the exceptions briefed have been fully considered, though perhaps not mentioned in every detail, and we find no error prejudicial to the defendant.

*Judgment affirmed.*